IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

SPARTANBURG DIVISION

| | |
|---|---|
| Tammie Smith,<br><br>    Plaintiff,<br><br>  vs.<br><br>Daimler Trucks NA, LLC,<br>Freightliner Custom Chassis Corp.,<br>and Daimler Trucks NA Disability<br>Benefits Plan,<br><br>    Defendants. | Civil Action No. 7:14-2058-BHH-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

    This matter is before the court on the plaintiff's partial motion for summary judgment (doc. 32) and the defendants' partial motion for summary judgment (doc. 45). Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and Local Civ. Rule 73.02(B)(2)(g) (D.S.C.), this magistrate judge is authorized to review all pretrial matters in employment discrimination cases and submit findings and recommendations to the district court.

    In her amended complaint (doc. 24), the plaintiff alleges causes of action for: (1) interference with rights in violation of the Family and Medical Leave Act ("FMLA"); (2) retaliation in violation of the FMLA; (3) breach of contract; (4) breach of contract accompanied by fraudulent act; (5) disability discrimination in violation of the Americans with Disabilities Act ("ADA"); (6) retaliation under Section 510 of the Employee Retirement Income Security Act ("ERISA"); (7) retaliation for filing a claim for workers' compensation benefits; and (8) denial of short term disability benefits in violation of Section 502 of the ERISA.

    The plaintiff has moved for summary judgment (doc. 32) on Count VIII, and the defendants have moved for summary judgment (doc. 45) on all other claims.

## FACTS PRESENTED

*Employment*

The plaintiff began working for defendants Daimler Trucks NA and its subsidiary, Freightliner Custom Chassis Corp. (collectively "Daimler"), in the Assembly Department in 2003 (doc. 50-1, pl. dep. 17, 38). Daimler Trucks is the Plan Sponsor of defendant Daimler Trucks NA Disability Benefits Plan ("the Plan") (doc. 32-2 at SEA 14; doc. 32-3, Plan dep. 8). The Claims Administrator for the Plan is Sedgwick Claims Management Services ("Sedgwick") (doc. 32-2 at 14; doc. 32-3, Plan dep. 9-10).

At the time she was hired, the plaintiff recalls receiving a Guide for Employees, or something like it (doc. 45-1, pl. dep. 40-41; doc. 45-2 at 41-50). She cannot remember if she got different versions of the Guide for Employees during her employment (doc. 45-1, pl. dep. 41). However, she does recognize her signature dated May 3, 2011, on the "Important Notice" attached to the 2011 version of the Guide for Employees (*id.* 42), which states in pertinent part:

### IMPORTANT NOTICE

PURSUANT TO S.C. ST. ANN. 41-1-110, THE POLICIES, PROCEDURES AND STANDARD PRACTICES DESCRIBED IN THIS EMPLOYEE GUIDE DO NOT UNDER ANY CIRCUMSTANCE CREATE AN EXPRESS OR IMPLIED CONTRACT OF EMPLOYMENT BETWEEN FREIGHTLINER CUSTOM CHASSIS CORPORATION ("FCCC") AND ANY OF ITS EMPLOYEES, NOR SHALL IT BE CONSIDERED OR INTERPRETED AS SUCH FOR ANY PURPOSE. THIS HANDBOOK IS FOR INFORMATIONAL PURPOSES ONLY.

EMPLOYMENT BETWEEN FCCC AND ITS EMPLOYEES IS AND SHALL BE AT-WILL AND OF INDEFINITE DURATION. I UNDERSTAND THAT THIS MEANS THAT EITHER I OR FCCC MAY TERMINATE OUR EMPLOYMENT RELATIONSHIP AT ANY TIME, WITH OR WITHOUT NOTICE, FOR ANY LAWFUL REASON OR FOR NO REASON. . . .

(Doc. 45-3 at 30).

During the plaintiff's employment, she was granted FMLA leave from August 25-September 2, 2005; May 15-23, 2006, June 28-August 14, 2006, April 8-29, 2013, and June 20-July 1, 2013, and she had no issues with anyone from Daimler about taking such FMLA leave (doc. 45-1, pl. dep. 46-54, 56, 64-65, 69).  The plaintiff also applied for benefits under Daimler's Short Term Disability Plan without experiencing any negative reaction, push-back, or animus in October 2012, April 2013, and June 2013 (*id.* 61-62, 65, 71).

The plaintiff's supervisor never had any problems with the plaintiff as an employee, and she never had to take any form of disciplinary action against her (doc. 50-2, Haskins dep. 7).

***Injury***

On Friday, September 27, 2013, the plaintiff injured her right hand at work when the torque gun she operated jerked and she felt a pop and tingling in her wrist (doc. 50-1, pl. dep. 72-73).  She reported the matter to her team supervisor, Leonard Blackwell, the following Monday, September 29, 2013 (doc. 45-1, pl. dep. 74).  Blackwell sent the plaintiff to the nurse, who applied a cold compress and gave her ibuprofen (*id.* 75).  The plaintiff and Blackwell filled out an accident report, and the plaintiff signed it (*id.* 75-77; *see* doc. 45-3 at 42).

On October 3, 2013, the plaintiff joined Coop's Gym ("Coop's") in order to lose weight (*id*. 139, 142).  She joined after learning about the gym at a health fair sponsored by Daimler (*id*. 141).  She disclosed to Coop's that she had right side carpal tunnel syndrome (doc. 50-3, Coop's questionnaire).  She began working out on October 4, 2013 (doc. 50-4, Coop's Check-in History).

On October 8, 2013, the plaintiff saw Daniel Peters, a physician assistant contracted to see Daimler's employees at the Gaffney Plant (doc. 50-1, pl. dep. 84-86; doc. 50-5, Peters dep. 12-15).  The plaintiff informed Peters of her gym activities (doc. 50-1, pl. dep. 113; doc. 50-6, pl. WC dep. 60).  Peters told the plaintiff to avoid using the treadmill

at the gym, as she complained that the vibrations hurt her wrist (doc. 50-1, pl. dep. 113). Peters imposed certain restrictions in writing during this visit: "No tight gripping R[ight] hand more than 5 lb. effort. Continue same plans . . . . avoid vibration tools" (doc. 50-7, Peters notes). The plaintiff informed Peters that her job involved gripping tools (doc. 50-1, pl. dep. 87). Peters told the plaintiff that the restrictions were for her to get off the job she was on and "limited use" of her hand (*id*. 87-89). Michael Prouix, the assistant in the medical department, informed the plaintiff's supervisor (Dannon Haskins) and the defendant's safety supervisor (William Harris) of the written restrictions on October 8th and asked them whether they could accommodate those restrictions (doc. 50-8, Prouix email; doc. 50-2, Haskins dep. 8).

The plaintiff continued exercising at Coop's without any problems, and she informed her trainer of her condition and restrictions (doc. 50-1, pl. dep. 144-45). She worked out on the evenings of both October 10 and 16, 2013 (doc. 50-1, pl. dep. 143-44; doc. 50-4, Coop's Check-In History; doc. 50-9, Coop's Service Usage Detail).

During this time, Daimler was supposed to be providing the plaintiff with work consistent with her restrictions (doc. 50-1, pl. dep. 87-89; doc. 50-10, Sedgwick WC Claim File). Haskins first put the plaintiff on a job that required gripping (doc. 50-1, pl. dep. 90-91). When the plaintiff told Haskins that the job involved gripping, he moved the plaintiff to cleaning (*id.* 91-92). The plaintiff perceived Haskins to be helpful in trying to find a job that fit her restrictions (*id.* 92). The plaintiff was also assigned to work in the containment area where she had to fix and tighten parts, which violated her restrictions (*id*. 92-94). At first, someone was assigned with her because she was not supposed to be using the wrench and turning (*id.* 94). However, that person was later moved somewhere else, and the plaintiff was left alone to do the work (*id*. 94-95). The defendant also assigned the plaintiff to train someone on sub-panel work, which required using a torqueing power gun (*id*. 97-

100).  At first, the plaintiff could tell the person what to do, but when he was pulled away to do another job, the plaintiff "had to do it" (*id.* 99).

The plaintiff saw Peters for follow up on October 22, 2013 (*id.* 93; doc. 50-11, Peters notes).  The plaintiff informed Peters what she had been doing at work, and Peters commented that it violated his restrictions (doc. 50-1, pl. dep. 103-04).  Peters continued the same restrictions for the plaintiff (doc. 50-11, Peters notes).  Peters told the plaintiff to tell her supervisor and team leader that the work she was performing violated her restrictions, which she did (doc. 50-1, pl. dep. 105-106).  Haskins initially put the plaintiff back on cleaning, but it did not last long.  The plaintiff was required to substitute for other employees and perform functions that violated her restrictions (*id.* 108).

On October 24, 2013, the plant nurse, Andrea Phillips, notified Sedgwick Insurance, which handles Daimler's workers' compensation and short term disability benefits, that the defendant did not question the plaintiff's injury (doc. 50-12, WC Claim File).

The plaintiff worked out again at Coop's on October 24, 2013 (doc. 50-1, pl. dep. 144-45; doc. 50-9, Coop's Service Usage Detail).  Coop's posted a picture of the plaintiff on Facebook, congratulating her on her progress towards her weight loss goals (doc. 50-16, Coop's Facebook post).

Peters saw the plaintiff again on November 5, 2013.  He reviewed the nerve conduction test, which confirmed carpal tunnel syndrome (doc. 50-13, Carolinas Center Nerve Test Report; doc. 50-5, Peters dep. 16, 19, 20).  Peters continued the existing restrictions imposed on the plaintiff (doc. 50-14, Peters notes).  The plaintiff went back to working on electrical panels or "helping out in sub areas" (doc. 50-1, pl. dep. 114).  While the plaintiff at first had someone who was supposed to be helping her, that person left to cover another job, and she ended up doing work that was outside her restrictions (*id.*).  Sometimes the plaintiff would ask co-workers to help her and sometimes co-workers would

5

volunteer to help her when she had to do work that violated her restrictions (*id.* 115).  The plaintiff did not tell Haskins and Blackwell every time she had to do something that violated her restrictions because they knew her restrictions and saw her working alone, but she did tell them at times (*id.* 118-19).

The plaintiff worked out on November 4 and 11, 2013 (doc. 50-9, Coop's Service Usage Detail).  On November 4th, Coop's posted to Facebook a picture of the plaintiff and mentioned her weight loss achievements (doc. 50-17, WC Claim File, DAIM F-59).

The plaintiff's last workout at Coop's while on restrictions was during the evening of November 18, 2013 (doc. 50-6, pl. WC dep. 58; doc. 50-9, Service Usage Detail) The plaintiff did no exercises that aggravated her wrist (doc. 50-18, pl. aff. ¶¶ 3, 4).  Her weight loss program worked well, as the plaintiff met her weight loss and overall health improvement goals (*id.* ¶ 5).

### November 19th Restrictions

On November 19, 2013, the plaintiff met with Peters again (doc. 50-1, pl. dep. 120).  The plaintiff informed Peters that her supervisors were not accommodating her and were forcing her to perform functions that violated the restrictions Peters imposed (*id.* 120-121; doc. 50-5, Peters dep. 24).  Peters responded by imposing the restriction:  "[N]o use of r[ight] hand" for two weeks (doc. 50-19, Peters notes).  Peters testified that he imposed this restriction to make it hard for Daimler to place the plaintiff (doc. 50-5, Peters dep. 26–27).  The plaintiff stopped going to Coop's when Peters imposed the no use of right hand restriction (doc. 50-6, pl. WC dep. 58-60).  The plaintiff testified that the last date she worked out was November 18, 2013 (*id.*).

The plaintiff relayed her restrictions to Haskins, who determined that he did not have anything that would accommodate the plaintiff's no use of right hand restriction (doc. 50-2, Haskins dep. 16-17).  The plaintiff was not aware of anything she could have

6

done on the production floor without using her right hand (doc. 50-1, pl. dep. 121-122). Haskins told the plaintiff to tell Peters that he could not find anything within the restrictions, and when the plaintiff returned, Haskins told her that she was going to have to go home (*id.*). Haskins checked with Harris, the safety supervisor, to see if there was anything available for the plaintiff, but he did not have anything at that time (doc. 50-2, Haskins dep. 18–19). Harris did not check with any other supervisors to determine whether work was available elsewhere in the plant (*id.*). The plaintiff went to Human Resources, where she was instructed to file a short term disability claim until workers' compensation kicked in (doc. 50-1, pl. dep. 123-24). The plaintiff called in a claim for short term disability to Sedgwick on November 19, 2013 (doc. 32-4). The plaintiff was to return to work on December 2nd or 3rd (doc. 50-1, pl. dep. 124-26).

### Facebook Photographs

On November 20, 2013, a co-worker showed Nurse Phillips photographs on Facebook that Coop's Gym had posted showing the plaintiff working out (doc. 50-20, Phillips dep. 13-14). Phillips took screen shots of the photographs and forwarded them to Beverly Widener, the Human Resources Manager (doc. 45-6 at 5-11). On the same day, another employee called Widener and asked, "How can anybody that is on light duty be working out at the gym?" (doc. 45-5, Widener dep. 12-14). Phillips did not know when the photos were taken (doc. 5-20, Philips dep. 24). At the time she emailed the photographs to Widener, she believed the photographs showed the plaintiff violating the restrictions placed on her on November 19th (*id.*) and so informed Sedgwick in an email, stating, ""This is Tammy Smith at the gym yesterday. I guess when she left here we couldn't accommodate her one hand restrictions" (doc. 50-23, 11/20/13 email; doc. 50-22, Sedgwick WC claim file DAIM F-65 ("Claimant is not following her restrictions per 11/19/13 PA note."); doc. 50-23, Sedgwick WC Claim File DAIM F-72 ("I spoke with Andrea Phillips RN & confirmed another employee forwarded the gym photos to her, believed to have been

taken on 11/19/13.")). Phillips acknowledged that she never alleged to either Sedgwick or Widener that the plaintiff had violated earlier restrictions imposed by Peters (doc. 50-20, Phillips dep. 24-25). Widener never determined when the photographs were taken (doc. 50-15, Widener dep. 31-33).

Also on November 20, 2013, Phillips informed Widener that the plaintiff was not able to follow her restrictions at work due to having to use her right hand to grip (doc. 50-15, Widener dep. 24-25). Widener did not investigate whether anybody allowed the plaintiff to violate her restrictions on the job or whether anybody instructed the plaintiff to violate her restrictions on the job (*id.* 25-27). Phillips also did nothing to determine whether the work the plaintiff's supervisor and safety supervisor assigned to her complied with her earlier restrictions (doc. 50-20, Phillips dep. 38-41).

As of November 20, 2013, it was Widener's understanding that the plaintiff was still employed, but "put out of work" "in pending status" (doc. 50-15, Widener dep. 34).

The plaintiff repeatedly attempted to contact Human Resources in order to determine the status of her leave. She was unaware that the defendant was accusing her of wrongfully violating her work restrictions by exercising at Coop's (doc. 50-1, pl. dep. 125-27). Widener acknowledges knowing that the plaintiff was attempting to reach her (doc. 50-15, Widener dep. 35). Nobody at Daimler would return the plaintiff's calls (doc. 50-1, pl. dep. 130), nor did anyone at Daimler ever seek any clarification from the plaintiff, or inform her that it had formed the belief that the plaintiff violated Peters' "no use of right hand" restriction (*id.*).

After not being called back by Human Resources and leaving unreturned messages with the nurse's station, on December 2, 2013, the plaintiff called Sedgwick in order to find out how she could get a return-to-work or release form (doc. 50-1, pl. dep. 125-30; doc. 50-24, Sedgwick Claims Mgmt File, DAIM G-72). The plaintiff was told by Sedgwick not to return to work until she was contacted by Daimler (doc. 50-1, pl. dep. 128).

8

Also on December 2nd, Sedgwick documented that the plaintiff's leave qualified under the FMLA and that Phillips advised that the plaintiff "will be terminated due to filing claim with restrictions and then seen working out at gym with pictures on facebook/internet" (doc. 50-25, Sedgwick Claims Mgmt File, DAIM G-67-68; doc. 50-26, Plan dep. 31-32).

### *Termination*

On December 3, 2013, Widener drafted a termination letter that was sent to the plaintiff the next day (doc. 50-27, Widener email).  According to Widener, she made the decision to terminate the plaintiff's employment in early December 2013 (doc. 50-15, Widener dep. 33). The termination letter states that the plaintiff's employment "is terminated effective November 19, 2013" due to the plaintiff's "failure to follow physician instructions and providing false information related to your work's comp claim" (doc. 50-27, Widener email and letter).  The letter did not specify who the physician was, what the instructions were, or what information the plaintiff provided that allegedly was false (*id*.).  The letter also did not mention the Facebook photographs or the plaintiff's workouts at Coop's (*id*.).

The plaintiff received the termination letter on December 5, 2013 (doc. 50-1, pl. dep. 130).  The plaintiff called Daimler again, but no one returned her calls (*id*. 132-34).

### *Board of Appeals*

Daimler's Guide for Employees contains an Employment Policies section that provides in pertinent part:

> **BOARD OF APPEALS**
>
> ***
>
> Only issues of a disciplinary nature or issues surrounding the application of a plant policy, and not the policy itself, will be reviewed at this level of the process. Discipline as a result of . . . illegal activities (ie, theft, drug use on company property, etc) cannot be appealed to the Board of Appeals.  The decision of the Board of Appeals is determined by a majority vote of those members on the Board and is final.

> Employees wishing to utilize this procedure must submit to the
> Human Resources Manger a written request to appeal their
> case.  This request must be submitted no later than ten (10)
> calendar days following the decision rendered at Step 3. . . .

(Doc. 50-28 at 10). The Board has the authority to reinstate terminated employees, it has done so, and management has no power to veto its decisions (doc. 50-15, Widener dep. 47-48).

The plaintiff sent an appeal to Widener, dated December 5, 2013, seeking a review by the Board of Appeals (doc. 50-29).  The plaintiff did not receive any response (doc. 50-1, pl. dep. 134-35).  The plaintiff submitted a second request for an appeal dated December 12, 2013 (doc. 50-30; doc. 50-1, pl. dep. 135-36).  She also sent a letter specifically requesting information about the reasons why she was terminated and what Widener meant in her termination letter:

> In preparing to present my appeal, it would be helpful if I could
> be informed more specifically as to what physician instructions
> I failed to follow and what false information I supposedly
> provided concerning the worker's comp claim.

(Doc. 50-31).

In a letter dated December 18, 2013, Widener denied the plaintiff's request for review by the Board of Appeals, stating:

> You were terminated for failure to follow physician instructions
> as well as providing false information related to your worker's
> compensation claim which we deem to be tantamount to theft
> from the company. As stated on page 10 of Freightliner Custom
> Chassis Corporation's Employee Guide, issues as a result of
> illegal activities (ie. theft) cannot be appealed thus your request
> is denied.

(Doc. 50-32).  Widener's only communications with the plaintiff were the termination letter and her letter in response to the plaintiff's requests for a Board of Appeals hearing (doc. 50-15, Widener dep. 11-12).

10

Widener testified that when an employee is accused of wrongdoing, it is her job to oversee the investigation:

> Q. In terms of overseeing an investigation, what's your primary objective in overseeing investigations?
>
> A. Want to make sure that it's not one person's word against another. We want to make sure that we have all the facts and make sure that we treat all parties appropriately and fairly.
>
> Q. Would that include getting all sides of the story and considering all sides?
>
> A. Yes.

(*Id*. 9).  Widener further acknowledged:

> Q. Did either you or anybody at Freightliner/Daimler do anything to get Tammie Smith's side of the story before you terminated her employment?
>
> A. No.

(*Id*. 40). Widener never spoke with the plaintiff regarding the allegations against her (*id*. 11). Ultimately, Widener admitted that she had no information about the allegations other than the information in the email Phillips sent her, and she made the decision to terminate the plaintiff's employment solely on that information (*id*. 37-40). During her deposition, Widener was asked why she would not speak to or advise the plaintiff regarding the accusations against her and why she did not tell the plaintiff that she was terminated because of the Facebook pictures.  Widener stated that she assumed the plaintiff already knew why she was fired because "[t]his is a small town.  People talk" (*id*.  41-42).

While the termination letter and denial of request for review letter state that the plaintiff failed to follow "physician instructions," the defendants maintain that the plaintiff violated restrictions imposed by Peters, who is a physician assistant (doc. 45-7 at 12). Daimler management did not speak with Peters prior to terminating the plaintiff's employment and never asked him whether what the plaintiff was doing in the photographs

11

posted on Facebook was outside her restrictions (doc. 50-5, Peters dep. 35-36).  Peters

testified that, without knowing the dates the photographs were taken, he could not testify

whether the plaintiff was in violation because he would not know if she was on restrictions

at the time (*id.* 40).

As to when or what information the plaintiff ever provided with regard to her

workers' compensation claim, Widener testified as follows:

> Q. What was the first point in time that Tammie Smith provided
> any information with regard to her workers' compensation
> claim?
>
> A. I don't know.
>
> Q. What information did Tammie Smith provide with respect to
> her workers' compensation claim?
>
> A. I don't know.

(Doc. 50-15, Widener dep. 29).

> Q. And you have no knowledge of any information Tammie
> Smith ever provided with respect to her workers' compensation
> claim, do you?
>
> A. No.

(*Id*. 38).

Phillips testified that she initiated the workers' compensation claim for the

plaintiff on the day the plaintiff filed the accident report, September 29, 2013 (doc. 50-20,

Phillips dep. 7).  She testified that the accident report and the medical office note from the

same day were the only information provided by the plaintiff with respect to the workers'

compensation claim (*id.* 8).  She further testified as follows:

> Q. So Ms. Phillips, you don't have any information that anything
> that Ms. Smith told the company with respect to her wrist is
> untrue, do you?
>
> A. No.

(*Id.* 12-13).[1]  Phillips also confirmed that it is her job to report workers' compensation fraud

(*id.* 13).  Further, Phillips never told Widener that the plaintiff falsified any information:

> Q. Did you provide any information to Human Resources with respect to Tammie Smith's carpal tunnel situation other than in your e-mail of November 20, 2013 at 3:40 p.m.?
>
> A. No, not that I'm aware of, not that I recall.
>
> Q. Ms. Phillips, we handed you [Exh. ]. This is your e-mail of 11/20 at 3:40 p.m. . . . ?
>
> A. Yes.
>
> Q. And nowhere in this e-mail do you state that Tammie Smith provided any false information with respect to her workers' compensation claim, do you?
>
> A. No.

(*Id.* 13-14).

As noted above, Widener stated in the letter denying the plaintiff's requests

for review that "issues as a result of illegal activities (ie. theft) cannot be appealed . . ." (doc.

50-32).  Theft is one of the exceptions that exist for appeals under Daimler's policy (doc. 50-

28 at 10).  Widener agreed that terms such as "theft" and "etc." were limited to "illegal

activities" (doc. 50-15, Widener dep. 51).  Widener testified as follows in her deposition:

> Q. Absent illegal activity or any other reason specifically set forth in the second paragraph of the Board of Appeals policy, are there any other reasons under this policy for which an employee can be denied the right to pursue an appeal to the Board of Appeals?
>
> A. No.

---

[1] Phillips emphasized that she has never told anyone that the plaintiff provided information that was untrue and that she never questioned the plaintiff's injury or pain. Rather, after she saw the Facebook photographs, she questioned the degree of injury (doc. 50-20, Phillips dep. 10-11).  Phillips also acknowledged that Peters never questioned the plaintiff's problems and that, while he originally thought the plaintiff's wrist pain may have been secondary to medication, testing proved the plaintiff had carpal tunnel syndrome (*id.* 11-12).

(*Id.*).

### *Denial of Short Term Disability Benefits*

On December 9, 2013, the Plan issued its initial denial of the plaintiff's claim for short term disability benefits, stating in pertinent part: "This letter is to advise you that your benefits under the Short Term Disability Benefits are being denied effective November 20, 2013 due to being terminated from employment prior to first day absent for disability" (doc. 32-5).  This is the only decision issued by the Plan (doc. 32-3, Plan dep. 18).

There is no dispute that the plaintiff worked on November 19, 2013, and her first day of absence was November 20, 2013 (*id.* 24-25; doc. 32-6, pl. aff. ¶ 4).  In the Plan's Rule 30(b)(6) deposition, the deponent testified as follows:

> Q. The day prior to November 20, 2013, was November 19, 2013, correct?
>
> A. Correct.
>
> Q. And Ms. Smith was employed on November 19, 2013, was she not?
>
> A. As far as we knew, she was at the time.

(Doc. 32-3, Plan dep. 27).  The deponent further testified:

> Q. And Ms. Smith's claim date was 11/19, correct?
>
> A. Correct.
>
> Q. And she was employed on 11/19?
>
> A. As far as we knew, she was.
>
> Q. If Ms. Smith was employed on 11/19 and her claim date is 11/19, is there any language under Loss of Eligibility that would exclude her from receiving benefits?
>
> A. On the day she filed the claim, no, there wouldn't have been.

(*Id*. 28).  The Plan explained the basis for denial as follows:

14

Q. I'm still trying to understand the Plan's basis for denying benefits in this case. Is it the Plan's position that Ms. Smith was not employed on November 19, 2013?

A. Based on the termination e-mail that we received, she was terminated on November 19th.

Q. But the Plan knows she was not, her employment was not terminated by Daimler on November 19, right?

A. Correct.

Q. And if her employment was not actually terminated on November 19, 2013, how is she not eligible under the terms of the Plan?

A. She wasn't eligible based on the e-mail that we received stating she was terminated effective 11/19. Employment status, we do not know employment status when a person opens a claim, so we rely on information from the location, from their HR feed, from things that are entered into the claim. When we were informed that she was terminated effective 11/19, we go by what the location is stating, and she was no longer eligible for benefits.

Q. Even if the Plan knows that she was, in fact, not terminated on November 19?

A. Yes.

Q. Is it the Plan's position that a Plan sponsor can, in a later month, make a determination to retroactively terminate somebody and render them ineligible under the Plan?

A. Yes.

Q. But you can't point me to any language that permits that?

A. No.

(*Id*. 43-44).

The denial letter provided that the plaintiff could appeal the Plan's decision in writing within 180 days and that Sedgwick would evaluate the plaintiff's appeal and advise her of the determination within 45 days after her written request for appeal was received

(doc. 32-5).  It was also noted that if special circumstances required an extension of time, the plaintiff would be notified of such extension during the 45 days following her request for appeal (*id.*).  The plaintiff timely submitted her appeal of the Plan's decision to Sedgwick on March 20, 2014 (doc. 32-6).  To date, the plaintiff has not received a response to her appeal.

The Plan's stated process is to send appeals of initial denials to Sedgwick's National Appeals Unit (doc. 32-2, Plan dep. 10–12). The Plan admits, however, that it did not follow this process (*id.* 12) in this case:

> Q. Why didn't the Plan process Ms. Smith's appeal in accordance with the procedures in the Plan?
>
> A. It should have been done. It wasn't done.
>
> Q. And I'm asking, why wasn't it done?
>
> A. I can't answer that.  It was an oversight.

(*Id*. 39).  Instead, the Plan sent the plaintiff's appeal to Elizabeth Schell, who is Sedgwick's "client contact" at Daimler (*id.* 13-15, 40-41).  According to the Plan, the appeal was sent to Daimler "because it was a matter of employment and not because it was based on a medical determination" (*id.* 12).  However, the Plan admitted that there was nothing in the Plan that says that when denial is based on employment status, the appeal is handled differently (*id.* 14).  Further, there is nothing in the Plan that allows Daimler to intervene in the appeals process (*id.* 12).   In the email to Schell sending the appeals documents, the claims examiner stated, "Please advise what you would like me to send the attorney or how to handle this issue" (doc. 32-8, Moser email).  Schell responded in pertinent part, "The termination of her employment was not connected or related to her filing for [short term disability] and therefore no additional review is required by [Daimler Trucks North America] of this Appeal" (*id.*, Schell email).

The Plan further testified:

> Q. [I]s the Plan aware that the appeal process must be laid out in Plan documents?
>
> A. Yes.
>
> Q. And is the Plan aware that the appeal process laid out in the claim, in the Plan documents must be followed?
>
> A. Yes.
>
> Q. Did the Plan ever inform Tammie Smith that it did not follow the process laid out in the Plan document?
>
> A. No.

(Doc. 32-3, Plan dep. 15). The Plan acknowledges it has a statutory obligation to rule on the plaintiff's appeal, but states that it does not know whether it has considered ruling on the plaintiff's appeal (*id.* 45-46).

## APPLICABLE LAW AND ANALYSIS

Federal Rule of Civil Procedure 56 states, as to a party who has moved for summary judgment: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Once the movant has made this threshold

17

demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

The plaintiff has moved for summary judgment (doc. 32) on Count VIII, and the defendants have moved for summary judgment (doc. 45) on all other claims. Each claim will be considered in the order in which they are alleged in the amended complaint.

### Count I - FMLA Interference

The plaintiff alleges that Daimler interfered with her rights under the FMLA by "refusing her reinstatement and by terminating [her] employment while on a qualified leave" (doc. 24, ¶ 19). The FMLA grants eligible employees up to twelve workweeks of protected leave for "a serious health condition that makes the employee unable to perform the functions" of his or her job. 29 U.S.C. § 2612(a)(1)(D). "When returning from FMLA leave, an employee is also entitled to be restored to [her] previous position or an equivalent position, so long as [she] would have retained that position or an equivalent one absent the taking of leave." *Adams v. Anne Arundel Cnty. Pub. Sch.*, 789 F.3d 422, 426 (4th Cir. 2015) (citing *Yashenko v. Harrah's NC Casino Co.*, 446 F.3d 541, 546–47 (4th Cir.2006)). It is unlawful for employers to "interfere with, restrain, or deny the exercise of or the attempt to exercise" either right. 29 U.S.C. § 2615(a)(1). In order to successfully "make out an 'interference claim' under the FMLA, an employee must thus demonstrate that (1) [s]he is entitled to an FMLA benefit; (2) [her] employer interfered with the provision of that benefit;

18

and (3) that interference caused harm." *Adams*, 789 F.3d at 427.  An employee is not required to prove that her employer acted with discriminatory intent.  *See Ainsworth v. Loudon Cnty. Sch. Bd.*, 851 F. Supp. 2d 963, 977 (E.D. Va. 2012)(citations omitted).

   The defendants first argue that the plaintiff cannot establish interference because both the plaintiff and Daimler agreed that there were no vacant positions that she could perform without the use of her right arm and that taking leave to get better was the plaintiff's best option (doc. 45-7 at 17 (citing doc. 45-2, pl. dep. 121-22)). However, as noted by the plaintiff (doc. 50 at 17), she has not alleged that she was wrongfully placed on an FMLA leave, as the defendants seem to suggest (doc. 45-7 at 18).  Rather, the plaintiff complains that she was denied reinstatement and was retroactively terminated to deny her FMLA leave and other benefits (doc. 50 at 17).

   The defendants next argue that the plaintiff cannot establish the third element, that the interference caused harm, because she would have been fired anyway: "Defendants believed that Plaintiff had failed to adhere to her light-duty restrictions and falsified her worker's compensation claim by indicating she could not work, but at the same time lifting weights at a gym. Plaintiff was terminated for those reasons alone and would have been discharged even if she had not taken FMLA leave" (doc. 45-7 at 18).

> [A]n employer may terminate employees—even when on leave—if the employer discovers misconduct that would justify termination had leave not been taken. The  fact that the leave permitted the employer to discover the problems cannot logically be a bar to the employer's ability to fire the deficient employee.

*Mercer v. Arc of Prince George's Cnty., Inc.*, C.A. No.  DKC 12-0306, 2013 WL 451814, at *3 (D. Md. Feb. 5, 2013).

   Here, as argued by the plaintiff (doc. 50 at 17-18), the reason for her FMLA leave - the no use of right hand restriction imposed by Peters on November 19th - and the defendants alleged reasons for terminating her employment - failure to adhere to the

restriction and falsifying her workers' compensation claim - are inextricably intertwined. The plaintiff has presented evidence raising issues of material fact on the issue of whether her "discharge would have occurred whether she had taken FMLA leave or not," as contended by the defendants (doc. 45-7 at 18). That evidence includes testimony from Widener that she had no knowledge of any information the plaintiff provided with respect to her workers' compensation claim (doc. 50-15, Widener dep. 38); testimony from Phillips that she had no information that anything the plaintiff told the company with respect to her wrist was untrue (doc. 50-20, Phillips dep. 12-13); testimony from Phillips that she never told Widener that the plaintiff had falsified any information as to her workers' compensation claim (*id.* 13-14); testimony from Widener that the Appeals Board has the authority to reinstate terminated employees, it has done so, and management has no power to veto its decisions (doc. 50-15, Widener dep. 47-48); testimony from Widener that terms such as "theft" and "etc." in the Guide were limited to "illegal activities" and, absent illegal activity or any other reason specifically set forth in the Board of Appeals policy, there are no other reasons for which an employee can be denied the right to pursue an appeal (*id.* 51); evidence that the plaintiff was given work that violated her earlier restrictions; and evidence that Sedgwick informed Daimler on December 2nd that the plaintiff had called regarding her return from FMLA leave, and, the next day, Widener drafted a letter retroactively terminating the plaintiff's employment (doc. 50-25, Sedgwick Claims Mgmt File, DAIM G-67-68; doc. 50-26, Plan dep. 31-32; doc. 27).

Based upon the foregoing, summary judgment should be denied on the plaintiff's FMLA interference claim.

### Count II - FMLA Retaliation

The plaintiff further alleges that Daimler retaliated against her for taking FMLA leave by terminating her employment (doc. 24, ¶¶ 22-24). To establish a *prima facie* case, the plaintiff must prove that: "(1) she engaged in a protected activity; (2) her employer took

an adverse employment action against her; and (3) there was a causal link between the two events." *Adams*, 789 F.3d at 429. "If the employer can present a nondiscriminatory reason for its actions, the employee must then demonstrate that the proffered reason is pretext for FMLA retaliation." *Williams v. Johnson & Johnson, Inc.*, C.A. No. 2:13-cv-304-RMG, 2014 WL 5106890, at *2 (D.S.C. Oct. 10, 2014).

The defendants only challenge the plaintiff's ability to establish the third element (causal link) (doc. 45-7 at 19-20).  Temporal proximity between the adverse employment action and the protected activity has been deemed sufficient for purposes of establishing a *prima facie* case of causality. *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 551 (4th Cir. 2006).  Here, Daimler started to take action against the plaintiff immediately after she took leave, culminating in her termination from employment two weeks later.

The defendants argue that the plaintiff must prove that the protected activity was the "but-for" cause of her discharge (doc. 45-7 at 19-20).  In the case relied on by the defendants, *Taylor v. Rite Aid Corp.*, 993 F. Supp. 2d 551 (D. Md. 2014), the court cited the United States Supreme Court's decision in *Univ. of Texas Southeast Medical Center v. Nassar*, 133 S.Ct. 2517, 2533-34 (2013) (Title VII retaliation case), for the proposition that "a plaintiff 'must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer,' not just a 'motivating factor' to establish the causation element of a retaliation claim."  *See Taylor*, 993 F. Supp. 2d at 566.  However, as noted by the plaintiff, in *Foster v. Univ. of Maryland-Eastern Shore*, 787 F.3d 243, 250-52 (4th Cir. 2015), the Fourth Circuit Court of Appeals held that *Nassar* did not alter the causation prong of the *prima facie* case nor the pretext stage of a retaliation claim by a plaintiff, like the plaintiff here, proceeding under the *McDonnell Douglas*[2] burden-shifting framework.

---

[2]411 U.S. 792 (1973).

Moreover, in *Taylor*, the case relied on by the defendants (doc. 45-7 at 19), the District of Maryland found the plaintiff established a *prima facie* case where the plaintiff was terminated within a matter of weeks after she took her first FMLA leave, which the court found "sufficient for a reasonable jury to infer that she would not have been terminated if she had not . . . taken FMLA leave, even if she had recent performance problems." *Taylor*, 993 F. Supp. 2d at 567-68.

The defendants further argue that the plaintiff cannot establish a *prima facie* case because she was granted FMLA on previous occasions without incident (doc. 45-7 at 19-20). However, as argued by the plaintiff, the court must draw all factual inferences in favor of her as the non-moving party, and the inference could be drawn that her last leave was the proverbial "straw that broke the camel's back" (doc. 50 at 21). Moreover, while the plaintiff did testify that she did not know of anything she could have done without using her right hand on the production floor (doc. 45-2, pl. dep. 122), she has not alleged that she was wrongfully placed on FMLA leave, but rather that she was denied reinstatement and was retroactively terminated to deny her FMLA leave and other benefits.

Based upon the foregoing, the plaintiff has made out a *prima facie* case of FMLA retaliation. As the defendants have offered a legitimate, nondiscriminatory reason for her termination from employment - that the plaintiff "failed to follow physician instructions and provid[ed] false information relating to [her] worker's comp claim" (doc. 50-27) - the plaintiff must demonstrate that the proffered reason is pretext for FMLA retaliation. *Nichols v. Ashland Hosp. corp.*, 251 F.3d 496, 502 (4th Cir. 2001).

Here, as discussed above with regard to the *prima facie* case, Daimler started to take action against the plaintiff immediately after she took leave, culminating in her termination from employment two weeks later. "[W]hile timing is a factor in assessing whether an employer's explanation is pretextual, it is not usually independently sufficient to create a triable issue of fact." *Mercer v. Arc of Prince Georges Cty., Inc.*, 532 F. App'x 392,

22

399 (4th Cir. 2013). As stated recently by the Honorable David C. Norton, United States

District Judge, regarding the plaintiff's burden at this stage in an FMLA retaliation claim:

> "[T]he plaintiff can prove pretext by showing that the [defendant's] explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [retaliation]." *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004) (internal quotation marks omitted). While closeness in time "far from conclusively establishes the requisite causal connection," *Yashenko*, 446 F.3d at 551, "the trier of fact may still consider the evidence establishing the plaintiff's *prima facie* case and inferences properly drawn therefrom ... on the issue of whether the defendant's explanation is pretextual." *Reeves*, 530 U.S. at 143 (quoting *Burdine*, 450 U.S. at 255 n. 10 (1981)).

*Chauncey v. Life Cycle Engr., Inc.*, 2:12-CV-968-DCN, 2013 WL 5468237, at *17 (D.S.C.

Sept. 30, 2013). "[A] plaintiff's *prima facie* case, combined with sufficient evidence to find

that the employer's asserted justification is false, may permit the trier of fact to conclude that

the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530

U.S. 133, 148 (2000).[3] "Whether judgment as a matter of law is appropriate in any

particular case will depend on a number of factors. Those include the strength of the

plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation

is false, and any other evidence that supports the employer's case and that properly may

be considered on a motion for judgment as a matter of law." *Id.* at 148-49.

Like the plaintiff in *Chauncey*, in addition to temporal proximity, the plaintiff has

presented evidence discrediting her employer's stated reasons for her termination. *See*

*Chauncey*, 2013 WL 5468237, at *17. As set forth above with regard to the interference

---

[3]*Reeves* was brought under the Age Discrimination in Employment Act ("ADEA"). *Reeves*, 530 U.S. at 142. The Court in *Reeves* assumed that the *McDonnell Douglas* framework, which was developed to assess claims brought under Title VII, applied to the ADEA action and cited Title VII cases in assessing the plaintiff's burden at the pretext stage. *Id.* at 144-49. The summary judgment standard in *Reeves* is applicable to this case because "FMLA claims arising under the retaliation theory are analogous to those derived under Title VII and so are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*." *Yashenko*, 446 F.3d at 550-51 (citations omitted); *see also Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 502 (4th Cir.2001).

claim, the plaintiff has presented evidence that Widener had no knowledge of what information the plaintiff provided regarding her workers' compensation claim; Phillips had no information that anything the plaintiff told the company with respect to her wrist was untrue; Phillips never told Widener that the plaintiff had falsified any information as to her workers' compensation claim, the plaintiff was given work that violated her earlier restrictions; Widener's job is to oversee the investigation when an employee is accused of wrongdoing; the investigation would include getting all sides of the story (doc. 50-15, Widener dep. 9); nobody from Daimler, to include Widener, spoke with the plaintiff about the allegations against her (*id.* 11, 40); Widener made the decision to terminate the plaintiff's employment solely on the information sent to her by Phillips in the email on November 20, 2013 (*id*. 38-39); Phillips did not know when the photographs that were posted on Facebook were taken (doc. 5-20, Philips dep. 24); Widener never determined when the photographs were taken (doc. 50-15, Widener dep. 31-33); Daimler management did not speak with Peters prior to terminating the plaintiff's employment and never asked him whether what the plaintiff was doing in the photographs posted on Facebook was outside her restrictions (doc. 50-5, Peters dep. 35-36); and Widener drafted a letter retroactively terminating the plaintiff's employment the day after Sedgwick informed Daimler that the plaintiff had called regarding her return from FMLA leave.

In the motion for summary judgment and reply, the defendants argue that the plaintiff has failed to produce material evidence sufficient to show that Widener's good faith belief that the plaintiff had failed to follow her restrictions and falsified her workers' compensation claim was pretext for unlawful discrimination or retaliation (doc. 45-7 at 23-25, 29; doc. 52 at 3-10). As noted by the defendants, "it is the perception of the decisionmaker which is relevant." *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 217 (4th Cir. 2007) (citation omitted). Further, "'it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's [adverse

employment action].' " *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir.1998) (quoting *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 411 (7th Cir.1997)). However, here, the plaintiff has evidence that her termination occurred the day before she was to return from FMLA leave, Widener terminated her employment retroactively solely based on the emailed photographs from Phillips, neither Phillips nor Widener determined when the photographs were taken, and Widener did not follow the typical procedure for investigation. *See Kennedy v. Credit Cent., Inc.*, C.A. No. 2:10-1661-RMG-BHH, 2011 WL 6780114, at *14 (D.S.C. Oct. 18, 2011) (recommending denial of summary judgment on Title VII retaliation claim based on similar evidence), *adopted by* 2011 WL 6780902 (Dec. 27, 2011). Because the facts are such that a "reasonable jury could return a verdict for [the plaintiff]," *Anderson*, 477 U.S. at 248, the plaintiff has produced sufficient evidence to raise a genuine issue as to whether defendants' non-discriminatory explanation is pretextual. Accordingly, summary judgment should be denied as to the FMLA retaliation claim.

### Count III - Breach of Contract

The plaintiff next alleges that Daimler's Guide For Employees, which contained an appeal process for terminations, created an employment contract and that Daimler breached that agreement by denying her the opportunity to appeal her termination as outlined in the Guide (doc. 24, ¶¶ 25-29). In South Carolina, employment is presumed to be at-will, meaning that an employee may be terminated any time, for any reason, with or without cause. *Hessenthaler v. Tri–County Sister Help, Inc.*, 616 S.E.2d 694, 697 (S.C. 2005) (citations omitted). "The issue of whether an employee handbook constitutes a contract should be submitted to the jury when the issue of the contract's existence is questioned and the evidence is either conflicting or is capable of more than one inference." *Watkins v. Disabilities Bd. of Charleston Cnty.*, 444 F.Supp.2d 510, 514 (D.S.C. 2006). However, a court should resolve whether the employee handbook constitutes a contract as a matter of law when the employee handbook's policies and disclaimers, taken together,

establish that an enforceable promise does or does not exist. *Id*. While an employee handbook may create an employment contract, it does so only when: "(1) the handbook provisions and procedures in question apply to the employee; (2) the handbook sets out procedures binding on the employer; and (3) the handbook does not contain a conspicuous and appropriate disclaimer." *Bishop v. City of Columbia*, 738 S.E.2d 255, 259 (S.C. Ct. App. 2013) (citations omitted).  South Carolina Code Annotated Section 41-1-110 provides as follows:

> It is the public policy of this State that a handbook, personnel manual, policy, procedure, or other document issued by an employer or its agent after June 30, 2004, shall not create an express or implied contract of employment if it is conspicuously disclaimed. For purposes of this section, a disclaimer in a handbook or personnel manual must be in underlined capital letters on the first page of the document and signed by the employee. For all other documents referenced in this section, the disclaimer must be in underlined capital letters on the first page of the document. Whether or not a disclaimer is conspicuous is a question of law.

S.C. Code Ann. § 41-1-110.

Daimler argues that the Guide for Employees did not create an employment contract with the plaintiff because the Guide contained a conspicuous disclaimer (doc. 45-7 at 22).  However, as provided above, in order for such a disclaimer to be conspicuous as a matter of law, it must be "in underlined capital letters." S.C. Code Ann. § 41-1-110.  The disclaimer at issue here is in capital letters, but only the heading "Important Notice" is underlined (doc. 50-28 at 2).  *See McClurkin v. Champion Labs., Inc.*, C.A. No. 0:11-cv-2401-CMC, 2011 WL 5402970, at *3 (D.S.C. Nov. 8, 2011) (finding disclaimer did not meet statutory requirements of § 41-1-110 because it was not in capital letters).  Accordingly, the court cannot dismiss the plaintiff's breach of contract claim based on the defendants' argument that the disclaimer is conspicuous as a matter of law.  *Id.*

26

The only other argument by the defendants in support of summary judgment as to this claim is that the plaintiff stated in her deposition, "I didn't believe I had a contract " (doc. 45-2, pl. dep. 166), which the defendants claim "erases any residual doubt about her status as an at-will employee" (doc. 45-7 at 22).  The undersigned disagrees.  A review of the full context of this testimony is set forth below:

> Q. Now, one of the claims that you have made in this case is that by terminating your employment, it constitutes a breach of contract. Now, I don't expect you to be a lawyer. But from your perspective, what do you understand the contract to be?
>
> A. I don't understand. It would have to be explained. Because, I mean, just by you saying that, I don't understand the question.
>
> Q. So you don't know what the contract – you don't know what contract was breached? You don't know what contract you had, if you had any at all?
>
> A. No. I do not know what contract was breached. Because no one informed me of what I did wrong. No one talked to me.
>
> Q. Did you think you had a contract of employment of some sort with Freightliner?
>
> MR. MURPHY: Object to the form.
>
> THE WITNESS: Can you rephrase that, what you are talking about contract because . . .
>
> BY MR. BRIGHT:
>
> Q. I am just repeating what your Complaint says.
>
> A. Well, I don't know what legal term is put in. Because I didn't believe I had a contract. No, I did not know that.

(Doc. 50-1, pl. dep. 165-66).  As argued by the plaintiff, it is clear that she did not understand the legal context of the question as it regards her handbook claims, and the undersigned declines to ascribe special significance to such testimony.  *See, e.g., Evans v. Tubbe*, 657 F.2d 661, 665 (5th Cir. 1981) ("At most, the plaintiffs' lay 'admissions'

testimony illustrates only that these non-lawyers misunderstood the legal term of art, 'easement.'").

Here, the Guide contains mandatory language stating that "issues of a disciplinary nature or issues surrounding the application of a plant policy . . . will be reviewed at [the Board of Appeals] level of the process" (doc. 50-28 at 10).  Because the Guide contains mandatory language as well as a non-conspicuous disclaimer, it is inherently ambiguous. *See Lord v. Kimberly-Clark Corp.*, 827 F.Supp.2d 598, 603-604 (D.S.C. 2011); (denying summary judgment where handbook contained mandatory language and a non-conspicuous disclaimer); *Horton v. Darby Elec. Co.*, 599 S.E.2d 456, 460 (S.C. 2004) ("An employee manual that contains promissory language and a disclaimer is 'inherently ambiguous,' and a jury should interpret whether the manual creates or alters an existing contractual relationship.") (citation omitted).

Based upon the foregoing, summary judgment should be denied as to the breach of contract cause of action.

### Count IV - Breach of Contract Accompanied by a Fraudulent Act

The plaintiff next alleges that Daimler committed "one or more" fraudulent acts in conjunction with breaching the alleged employment contract created by the appeals policy in the Guide For Employees (doc. 24, ¶ 32). Specifically, the plaintiff alleges that Daimler made "blatant misrepresentations regarding its reasons for termination and for denying Plaintiff the right to an appeal that would expose their dishonesty" (*id.*). To establish a claim for breach of contract accompanied by fraudulent act, the plaintiff must prove: "(1) a breach of contract; (2) fraudulent intent relating to the breaching of the contract and not merely to its making; and (3) a fraudulent act accompanying the breach." *Conner v. City of Forest Acres*, 560 S.E.2d 606, 612 (S.C. 2002).

The defendants make only one argument in support of summary judgment on this claim:

> Plaintiff's claim fails for a single reason: there was no contract.
> . . . As explained above, [the Guide] included a conspicuous
> disclaimer . . . [that] unequivocally satisfies the requirements of
> § 41-1-110.  Moreover, Plaintiff has all but acknowledged that
> she did not have an employment contract . . . .

(Doc. 45-7 at 23).  As discussed above, Daimler's disclaimer in the Guide *does not*

"unequivocally" satisfy the requirements of Section 41-1-110 as it is not underlined.

Furthermore, the plaintiff's testimony on a question regarding the legal contours of her case

does not equal a legal admission.  Accordingly, summary judgment on this claim should be

denied.

### *Count V - ADA Discrimination*

The plaintiff further contends that she was discharged because of her alleged

disability, carpal tunnel syndrome, in violation of the ADA (doc. 24, ¶¶ 33-40).

> To establish a claim for disability discrimination under the ADA,
> a plaintiff must prove "(1) that she has a disability, (2) that she
> is a 'qualified individual' for the employment in question, and (3)
> that [her employer] discharged her (or took other adverse
> employment action) because of her disability." *EEOC v. Stowe-
> Pharr Mills, Inc.*, 216 F.3d 373, 377 (4th Cir.2000). Disability
> discrimination may be proven through direct and indirect
> evidence or through the *McDonnell Douglas* burden-shifting
> framework. *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 49-
> 50 & n. 3, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003).

*Jacobs v. N.C. Admin. Off. of the Courts*, 780 F.3d 562, 572 (4th Cir. 2015).  The Fourth

Circuit has held that the "motivating factor" causation standard of Title VII is applicable to

ADA claims. *Baird v. Rose*, 192 F.3d 462, 470 (4th Cir.1999).

The defendants argue that the plaintiff cannot prove causation and has failed

to show that the reasons given for her termination from employment were pretext for

disability discrimination (doc. 45-7 at 23-25).  Based on the reasons discussed above with

regard to the plaintiff's FMLA retaliation claim, issues of material fact remain, and summary

judgment should be denied.

### Count V - ADA Accommodation

The plaintiff further alleges that Daimler failed to reasonably accommodate her disability (doc. 24, ¶ 39). "To establish a *prima facie* case for failure to accommodate, [the plaintiff] must show: '(1) that [she] was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [her] disability; (3) that with reasonable accommodation [she] could perform the essential functions of the position; and (4) that the employer refused to make such accommodations.'" *Jacobs*, 780 F.3d at 579 (quoting *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir.2013) (brackets and ellipsis omitted)).

The defendants argue that the ADA accommodation claim should be dismissed because Daimler engaged her in the interactive process through Peters and the plaintiff's supervisors, and worked to accommodate her restrictions (doc. 45-7 at 25-27). The defendants note that employees were trying to help the plaintiff get better, and, as a result of the interactive process, Peters placed her on light-duty restrictions (doc. 45-1, pl. dep. 84, 87). The defendants further argue that the plaintiff's supervisors placed her in jobs where she did not have to use her right arm to excess and arranged for her to have help whenever she needed to complete a task requiring the use of her right arm (*id.* 90-91, 94; doc. 45-2, pl. dep. 95, 98-99, 108, 118-19). The defendants also contend that when the plaintiff reported that her condition was not improving, her supervisor and Peters each met with her and again engaged her in the interactive process in an attempt to accommodate her restrictions, ultimately agreeing that there were no vacant positions that would meet the plaintiff's restrictions and that a temporary leave of absence would be the best way to accommodate the plaintiff (doc. 45-2, pl. dep. 121-22). The plaintiff acknowledged that there was nothing she could do on the production floor with the one hand restriction (*id.*).

In response to the motion for summary judgment, the plaintiff does not address the ADA accommodation claim (*see* doc. 50 at 28-30). Accordingly, it appears that

the plaintiff has abandoned this claim, and, therefore, summary judgment should be granted to the defendants on the plaintiff's ADA accommodation claim. *See, e.g., Doe v. Berkeley County School District*, C.A. No. 2:13-cv-3529-PMD, 2015 WL 7722424, at *3 n.1 (D.S.C. Nov. 30, 2015); *Mejica v. Montgomery Cty.*, C.A. No. RDB-12-823, 2014 WL 4634298, at *4 (D. Md. Sept. 15, 2014) ("A non-moving party abandons a claim where the party fails to respond to an argument raised in a dispositive motion.").

### Count VI - ERISA Section 510 Retaliation

The plaintiff next alleges that Daimler unlawfully retaliated against her by terminating her employment in violation Section 510 of ERISA (doc. 24, ¶¶ 42-45), which states that "[i]t shall be unlawful for any person to discharge . . . a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." 29 U.S.C. § 1140. The Fourth Circuit has held "that the *McDonnell Douglas* scheme of presumptions and shifting burdens of production is appropriate in the context of discriminatory discharge claims brought under § 510 of ERISA." *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 239 (4th Cir. 1991). To establish a *prima facie* case for a violation of Section 510, a plaintiff must show that (1) he or she was a participant in a benefit plan; (2) his or her job performance meets the employer's legitimate expectations; (3) the employer took adverse employment action; and (4) the existence of a causal connection between the adverse employment action and the claimant's status as a participant in the plan. *Taliaferro v. Associates Corp. of N. Am.*, 112 F.Supp.2d 483, 492-93 (D.S.C. 1999) (citation omitted).

The defendants argue that the plaintiff has failed to offer any evidence to support a causal nexus between her claim for benefits and her termination from employment (doc. 45-7 at 28-29). The defendants note that the plaintiff had previously filed for short term disability benefits without incident, and it was agreed that leave was the best way to accommodate the plaintiff's restrictions. However, as argued by the plaintiff, the

31

defendants have offered no authority for the proposition that acting lawfully in the past can establish as a matter of law that Daimler acted lawfully with respect to the matter in dispute. The defendants further argue that the plaintiff "categorically denied" being terminated because she filed a claim for short term disability benefits (*id.* at 28). During the plaintiff's deposition, the following exchange took place:

> Q: Who informed you you were being terminated because you filed a claim for short-term disability?
>
> A: It wasn't for short-term disability. They said I was being terminated for falsifying information and that was the reason I was given.

(Doc. 45-2, pl. dep. 168). In the context of the question asked, the plaintiff's answer, viewed in a light most favorable to the plaintiff, is not an "unequivocal acknowledgment that her discharge had nothing to do with her [short term disability] claim" as characterized by the defendants (doc. 45-7 at 29). Rather, the plaintiff responded that Daimler did not tell her that she was being terminated from employment because of her short term disability claim (*see* doc. 50-18, pl. aff. ¶ 9 ("I was only trying to answer the question that was asked: no one told me I was being fired because I filed a claim for short term disability.")).

The plaintiff has presented evidence showing the following: although the termination decision was not made until early December, the termination letter written by Widener states that the plaintiff was terminated "effective November 19, 2013" (doc. 50-27); when Widener saw the Facebook photographs on November 20th, she was aware that the plaintiff was still employed at that time (doc. 50-15, Widener dep. 34);  Daimler has conceded that Widener's termination of the plaintiff was "retroactive" (doc. 37 at 2); the retroactive termination of employment was the only reason the Plan used for denying the plaintiff ERISA benefits (doc. 32-1 at 2; doc. 32-5 ("[Y]our benefits under the Short Term Disability Benefits are being denied effective November 20, 2013 due to being terminated from employment prior to first day absent for disability."); and Widener, who made the

32

decision to date the plaintiff's termination as effective November 19, 2013, was unable to identify any other termination where the date was designated retroactive (doc. 50-15, Widener dep. 49-50). The undersigned finds that the foregoing evidence is sufficient to establish the causal connection element of a *prima facie* case.

The defendants further argue that the plaintiff has failed to show that the reasons given for her termination from employment were pretextual (doc. 45-7 at 29). Based on the reasons discussed above with regard to the plaintiff's FMLA retaliation claim, issues of material fact remain, and summary judgment should be denied.

### Count VII - Workers' Compensation Retaliation

The plaintiff also contends that Daimler terminated her employment in violation of South Carolina Code Annotated Section 41-1-80 because of her claim for workers' compensation benefits (doc. 24, ¶¶ 46-48). That statute provides that "[n]o employer may discharge or demote any employee because the employee has instituted or caused to be instituted, in good faith, any proceeding under the South Carolina Workers' Compensation Law." S.C. Code Ann. § 41-1-80. "In order to prove a claim under Section 41-1-80, a plaintiff must establish three elements: 1) institution of workers' compensation proceedings, 2) discharge or demotion, and 3) a causal connection between the first two elements." *Hinton v. Designer Ensembles, Inc.*, 540 S.E.2d 94, 97 (S.C. 2000) (citations omitted). The causation element "requires the employee to establish that he would not have been discharged 'but for' the filing of the claim." *Wallace v. Milliken & Co.*, 406 S.E.2d 358, 360 (S.C. 1991). As noted by the defendants, temporal proximity alone is insufficient to prove a causal connection, *Marr v. City of Columbia*, 416 S.E.2d 615, 617 (S.C. 1992), but temporal proximity and other circumstantial evidence may be sufficient. *Wallace*, 406 S.E.2d at 360-61.

The defendants argue that the plaintiff cannot establish the causal connection element of her claim because she was terminated due to her violation of the work

restrictions imposed by Peters and due to Daimler's belief that the plaintiff provided false information in conjunction with her workers' compensation claim (doc. 45-7 at 30-31).  The defendants argue, "The adverse action had nothing to do with the fact that Plaintiff filed for workers' compensation, but rather, the fact that Defendants believed Plaintiff did so fraudulently" (*id*. at 31).  The defendants characterize the following passage as showing that the plaintiff "unequivocally denied" that she was terminated for filing a workers compensation claim (doc. 45-7 at 31):

> Q: Did anyone ever say anything to you that led you to believe that you were being terminated because you filed a workers' compensation claim?
>
> A: I wasn't being terminated because I filed, no.
>
> Q: Okay.
>
> A: But to be honest, I don't really know why I was terminated.

(Doc. 50-1, pl. dep. 167).  As discussed above with regard to the plaintiff's ERISA Section 510 claim, the context makes clear that the plaintiff was answering the question asked, concerning whether anyone told her she was being retaliated against because she filed a workers' compensation claim. She was not testifying categorically that she was not the victim of retaliation (doc. 50-18, pl. aff. ¶ 8).

In addition to the temporal proximity between the plaintiff filing her workers' compensation claim and the termination of her employment, the plaintiff has presented evidence that Widener, who made the decision to terminate the plaintiff's employment and stated in the termination letter that it was based, in part, on the plaintiff providing false information related to her workers' compensation claim (doc. 50-27), had no knowledge of any information the plaintiff provided with respect to her workers' compensation claim (doc. 50-15, Widener dep. 38); that Phillips had no information that anything the plaintiff told the company with respect to her wrist was untrue (doc. 50-20, Phillips dep. 12-13); and Phillips

never told Widener that the plaintiff had falsified any information as to her workers' compensation claim (*id.* 13-14).  Viewing all the evidence in a light most favorable to the plaintiff, a reasonable trier of fact could find that Daimler's reasons for terminating the plaintiff's employment were pretextual, or that, "but for" the filing of the workers' compensation claim, she would not have been discharged.  Accordingly, summary judgment should be denied on this claim.

### Count VIII - ERISA Section 502 Violation

The plaintiff has moved for summary judgment on her cause of action for violation of Section 502(a)(1)(B) of ERISA, which provides that a participant or beneficiary may bring a civil action to, *inter alia*, recover benefits due her under the terms of an employee benefit plan. 29 U.S.C. § 1132(a)(1)(B).[4]  A court reviews a denial of benefits under 29 U.S.C. § 1132(a)(1)(B) "under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  In her motion for summary judgment on this claim, the plaintiff states that "nothing in the Plan provides the Plan Administrator with the requisite discretion," and, therefore, the *de novo* standard applies (doc. 32-1 at 11).  The Plan does not address the standard of review in its response in opposition (doc. 37) and apparently does not dispute that the *de novo* standard is appropriate.

In enacting ERISA, Congress established procedural safeguards to ensure that fiduciaries would administer employee benefit plans "solely in the interest of the participants and beneficiaries."  29 U.S.C. §§ 1104(a)(1) & 1001(b)*; see also Makar v. Health Care Corp. of the Mid–Atlantic*, 872 F.2d 80, 83 (4th Cir.1989). Fiduciaries must

---

[4] The defendants note that the period of short term disability benefits at issue in this matter is from November 19, 2013, until no later than December 3, 2013, when the plaintiff admitted that she was able to return to work (doc. 37 at 2 n.1 (citing 37-2, pl. dep. 164)).

provide "full and fair reviews" of claims for benefits. 29 U.S.C. § 1133; 29 C.F.R. § 2560.503–1. Plan Administrators are required to state the reason(s) for a denial and provide the specific plan provision(s) that formed the basis of the decision and must afford a reasonable opportunity for a full and fair review of the decision denying the claim. 29 U.S.C. § 1133; 29 C.F.R. § 2560.503–1; *see also Weaver v. Phoenix Home Life Mut. Ins. Co.*, 990 F.2d 154, 158 (4th Cir.1993). Moreover, the Plan Administrator must notify a claimant of the Plan's benefit determination on review not later than 45 days after receipt of the claimant's request for review by the Plan, unless the Plan Administrator determines that special circumstances require an extension, and written notice of the extension must be given to the claimant prior to the termination of the initial 45-day period. 29 C.F.R. § 2560.503-1(i)(1)(i), (3)(i).

The plaintiff argues there are no disputed facts and summary judgment should be awarded because the defendants bypassed Plan procedures and refused to pay benefits for reasons not supported by the Plan (doc. 32-1 at 1). The undersigned agrees. Under Daimler's Summary Plan Description, to obtain benefits, an individual must: (1) be an "Eligible Employee"; and (2) have a qualifying disability under the Plan (doc. 37-1). As noted above, the denial letter explained that the plaintiff's claim was denied because her employment ended prior to her leave of absence due to her alleged disability (doc. 32-4). The Plan now concedes that the plaintiff was an Eligible Employee as of November 19, 2013, the date she submitted her claim for short term disability benefits (doc. 37 at 5). "A district court's review is limited to whether the rationale set forth in the initial denial notice is reasonable." *Thompson v. Life Ins. Co. of North America*, 30 F. App'x 160, 164 (4th cir. 2002). Here, it is clear that the Plan's denial was not reasonable.

The Plan argues that "awarding Plaintiff benefits at this stage would be premature and in contravention of the Plan's terms" as "[t]o date, there has been no evaluation of Plaintiff's medical records or other documentation to determine whether or not

she has a Disability based on her alleged condition" (doc. 37 at 5 (emphasis in original)). Accordingly, the Plan contends that the "appropriate remedy is for the court to remand Plaintiff's claim to the Plan" (*id.*). For the reasons discussed below, the undersigned finds that remand is inappropriate, and, rather, summary judgment should be entered in favor of the plaintiff on this claim.

The undersigned agrees that normally where the Plan Administrator has failed to comply with ERISA's procedural guidelines and the plaintiff has preserved her objection to the Plan Administrator's noncompliance, the proper course of action for the court is remand to the Plan Administrator for a full and fair review. *See Weaver v. Phoenix Home Life Mut. Ins. Co.*, 990 F.2d 154, 159 (4th Cir. 1993). However, here, as argued by the plaintiff, the defendant Plan should not be permitted to now claim that it needs further proceedings to decide an issue that it earlier claimed to have already resolved (*see* doc. 40). Specifically, in paragraph 52 of the amended complaint, the plaintiff alleged that the defendant Plan had a single basis for denying her claim (i.e. that her employment was previously terminated) (doc. 24, ¶ 52). In their answer to the amended complaint, the defendants asserted: "Defendants admit that [the plaintiff's] request was denied in part based on the fact that her employment had terminated, but deny that this was the only reason . . . another reason being that she did not meet the program's requirements (including an actual disability)" (doc. 25, ¶ 43). As argued by the plaintiff, the Plan should not be permitted to now claim that it needs further proceedings to decide an issue that it claimed in its answer to have already resolved.

In its Rule 30(b)(6) deposition, the Plan testified that, contrary to the claim raised in the answer to the amended complaint, it did not deny benefits based on any medical reason (including any determination as to whether the plaintiff was disabled), but rather because Daimler informed the Plan that the plaintiff was terminated from employment effective November 19, 2013, and thus would not be an Eligible Employee (Doc. 32-3, Plan

dep. 43-44).  While the testimony of the Plan is clear that lack of a qualifying disability *was*

*not* a reason for the denial, a genuine issue of material fact is not created where the only

issue of fact is to determine which of the two conflicting versions of the nonmovant's story

is correct. *Barwick v. Celotex Corp*., 736 F.2d 946, 960 (4th Cir. 1984).  The Plan has

provided no evidence to support the assertion raised in its pleading.  The evidence

presented in this case is clear that the *only* reason for the denial was that the plaintiff was

"terminated from employment prior to first date absent for disability," and the defendants

now concede that the plaintiff was, in fact, an Eligible Employee on the date she submitted

her claim for short term disability benefits (doc. 37 at 5).

Moreover, the Plan may not offer *post hoc* rationales in response to a motion

for summary judgment.  As the Fourth Circuit has stated:

> LINA would have us bypass ERISA's procedural safeguards.
> Here, LINA denied Mr. Thompson's claim for benefits in
> September 1998, explaining that his cardiac condition
> disqualified him from receiving benefits under the Plan's
> pre-existing condition limitation. LINA also relied on the
> preexisting condition limitation to affirm the denial on appeal.
> When Mr. Thompson filed suit, LINA's Answer to Mr.
> Thompson's Complaint again set forth the pre-existing condition
> limitation as the sole reason for its denial. Not until the summary
> judgment stage in November 2000, did LINA assert the Plan's
> "active service" provision as the rationale for its denial of
> benefits.
>
> At this late stage, allowing LINA to raise a new basis for denial
> would deprive Mr. Thompson of the procedural fairness
> guaranteed to claimants under ERISA. Quite simply, Mr.
> Thompson and every other claimant is statutorily entitled to
> expect that plan administrators will follow mandatory rules of
> procedure. LINA had a fiduciary duty to consider Mr.
> Thompson's claim fully and fairly and to provide him with the
> specific disqualifying reason or reasons. See Weaver, 990 F.2d
> at 158. A district court's review is limited to whether the rationale
> set forth in the initial denial notice is reasonable. A court may
> not consider a new reason for claim denial offered for the first
> time on judicial review. We find that the district court erred in
> relying on LINA's "active service" argument when it reviewed
> LINA's decision for abuse of discretion.

38

*Thompson*, 30 F. App'x at 163-64.

Here, the evidence shows that, in contravention of the procedural safeguards of ERISA: 1) the initial denial of the plaintiff's claim does not reference the specific provision of the Plan on which denial is based (doc. 32-5); 2) when asked to point to the language in the Plan that supported the reason given, the Plan testified that it was the language defining an Eligible Employee (doc. 32-3, Plan dep. 27- 28 (referring to doc. 32-2 at 2-3)); 3) the Plan now admits that the plaintiff was an Eligible Employee as of the date of her claim; 4) the Plan could not explain why it would allow a Plan Sponsor to retroactively terminate the plaintiff's employment as a basis for denying benefits under the Plan (*id.* 38); 5) rather than following its stated process for appeals, upon receiving the plaintiff's timely appeal, the Plan instead sent the appeal to its client contact with the Plan Sponsor (*id.* 10-15); 6) the Plan has, to date, issued no decision on the appeal, and it has provided no information or justifications to the plaintiff (*id.* 15); and 7) the Plan acknowledges its obligation under ERISA  to rule on the appeal, but states it does not know whether it has considered ruling on the appeal (*id.* 45-47).   Given the foregoing evidence of the Plan's deviation from its own required procedures and demonstration of a "manifest unwillingness to give fair consideration to evidence that supports the claimant, the claim should not be returned to the [Plan]."  *Helton v. AT & T Inc.*, 709 F.3d 343, 360 (4th Cir. 2013) (quoting *Miller v. United Welfare Fund*, 72 F.3d 1066, 1075 (2d Cir.1995)) (Calabresi, J., concurring in part and dissenting in part)).

Based upon the foregoing, the plaintiff's motion for summary judgment as to Count VIII should be granted, and the defendant Plan should be directed to award the plaintiff the full amount of short term disability benefits to which she is entitled.

## CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, this court recommends that the plaintiff's motion for summary judgment (doc. 32) as to the Count VIII claim for violation of ERISA Section 502 be granted and the defendants' partial motion for summary judgment (doc. 45) be granted as to the plaintiff's ADA accommodation claim and denied as to all other claims.          IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

January 21, 2016
Greenville, South Carolina

40